UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 17-23010-CIV-SCOLA

EDUARDO E DIMINGO and all others )
similarly situated under 29 U.S.C. 216(b), )
                                                                           )
        Plaintiffs,               )
vs.                                        )
                                                                       )
MIDNIGHT XPRESS, INC., )
ET. AL., )
                                                                       )
        Defendants. )
_____ )

**PLAINTIFF'S AND COUNSEL'S RESPONSE IN OPPOSITION
TO DEFENDANTS' MOTION FOR SANCTIONS [DE 72]**

COME NOW Plaintiff and Counsel, regarding [DE 72] as follows:

## INTRODUCTION

Defendants' seek sanctions against Plaintiff and Counsel under Rule 11 of the Federal Rules of Civil Procedure. In FN3, Defendants allege that "If Plaintiffs do withdraw these claims prior to the expiration of the 21-day safe harbor provision of Rule 11, Defendants nevertheless intend to seek full recovery of their attorney's fees under alternative provisions, including this Honorable Court's inherent authority, 28 U.S.C. § 1927, and *Christianburg Garments Co.* v. EEOC." Upon filing this Response, Plaintiff and Counsel intend to seek sanctions against Defendants and defense Counsel for their baseless Rule 11 Motion [DE 72]. Defendants' Motion should be denied as follows.

## MEMORANDUM OF LAW AND ARGUMENT

**A. RULE 11 STANDARD; DEFENDANTS' MOTION IS ITSELF FRIVOLOUS.**

A clear distinction Section 1927 and Rule 11 is that rule 11 is designed to afford 21 day safe harbor period to make the appropriate corrections, while §1927 does not provide said safe harbor period. However, the Courts have found other distinct differences between the two rules.

> While many of the same general principles apply to sanctions under Rule 11 and sanctions under §1927, Rule 11 and §1927 are distinct sources of authority. They are aimed at addressing different kinds of misconduct, are

1

> different in scope, and are governed by quite different legal standards. See, e.g., *Byrne v. Nezhat*, 261 F.3d 1075, 1106 (11th Cir. 2001) (noting that Rule 11 "is aimed primarily at pleadings" and addresses the conduct of both parties and attorneys, while §1927 addresses "dilatory tactics throughout the entire litigation" and is focused solely on attorney conduct); *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991) (noting that Rule 11 permits attorney's fees "for conduct which merely fails to meet a reasonableness standard," **in contrast to a court's inherent powers, which require a higher showing**). Rule 11 cases do not dispose of the issues arising under § 1927 (emphasis added).

*Amlong & Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230, 1241 (11th Cir. Fla. 2006).

"When the Court evaluates a motion for sanctions under Rule 11, it must determine: (1) whether the accused party's claims or assertions are objectively frivolous in view of the facts or law; and if so, then (2) whether the person who signed the pleadings should have been aware that the claims or assertions were frivolous." *See, Worldwide Primates, Inc. v. McGreal*, 87 F.3d 1252, 1254 (11th Cir. 1996). The "Defendant, as the party seeking sanctions, must establish both elements, and the Court must resolve all doubts in Plaintiff's favor." *Pharma Supply, Inc. v. Stein et al.*, No. 14-80374-Civ-Cohn, 2015 WL 11439276, at *1 (S.D. Fla. May 27, 2015). In the case at bar, there is not a basis to argue the employment-relationship allegations raised in the Amended Complaint ("Complaint") were frivolous, or that Counsel should be aware of any frivolity. As reflected in Plaintiff's motion for summary judgment [DE 51], and his response [DE 68] to Defendants' motion for summary judgment, Plaintiff has raised good faith arguments that he was an FLSA employee (not an independent contractor).

Plaintiff also plans to file a cross-motion for sanctions against Defendants and defense Counsel. As stated by the Middle District of Florida in *McMahan Sec. Co. L.P.:* *"*Having determined that sanctions against MSC are not warranted, the Court addresses MSC's request for sanctions against Defendants for bringing a frivolous Rule 11 motion. Fed.R.Civ.P. 11(c)(1)(A) provides that "[i]f warranted, the court may award to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in presenting or opposing the motion." The Court does not take motions for sanctions lightly and deplores the waste of time and money spent on issues that should and could have

2

been resolved in another manner. MSC is the prevailing party with respect to Defendants' Rule 11 motion; however, the imposition of Rule 11 sanctions by a district court is discretionary. *See Fox v. Acadia State Bank*, 937 F.2d 1566, 1569 (11th Cir.1991). The Court exercises that discretion by denying MSC's motion for sanctions. However, the Court would suggest that Defendants think carefully before filing a third motion for sanctions." *McMahan Sec. Co. L.P. v. FB Foods, Inc.*, No. 8:04 CV 1791 T 24TGW, 2006 WL 2092643, at *3 (M.D. Fla. July 27, 2006). "Rule 11 authorizes a court to sanction a party who submits a pleading for an improper purpose. Fed.R.Civ.P. 11(b)(1). "[T]he filing of a motion for sanctions is itself subject to the requirements of the rule and can lead to sanctions." Fed.R.Civ.P. 11 advisory committee's note. Ordinarily, this does not require a cross-motion for sanctions, since a court is authorized to award fees to a party that successfully opposes a Rule 11 sanctions motion. *Id.* Thus, when a party files a Rule 11 motion for an improper purpose, the court may award fees to the target of the motion. Such is the case here." *Smith v. Psychiatric Sols., Inc.,* 750 F.3d 1253, 1260 (11th Cir. 2014). In *Claudet,* the court ruled that "[t]herefore, the Motion for Sanctions was filed for an improper purpose. *See* Fed.R.Civ.P. 11(b)(1) (describing an "improper purpose" to include harassment). Defense counsel will be required to pay Plaintiff's reasonable expenses, including attorneys' fees, in responding to the Motion for Sanctions. *See id.* 11(c)(1) (noting that the sanction may be imposed on "any attorney, law firm, or party"). *Claudet v. First Fed. Credit Control, Inc.*, 614CV2068ORL41DAB, 2015 WL 7984410, at *3 (M.D. Fla. Nov. 17, 2015)."

Defendants cite *Rodriguez v. Marble Care Int'l, Inc.,* 863 F.Supp.2d 1168 (S.D. Fla. 2012), which is not on point at all. *Rodriguez* concerned a very narrow ruling regarding the $500,000 prong of enterprise coverage; not a fact intensive dispute over the employment relationship. It is Plaintiff's position that, after significant discovery, there are ample facts to argue Plaintiff was an FLSA employee. Such is why Plaintiff himself moved for partial summary judgment on such issue [DE 51], but at the least there is a good faith argument to allege a question of material fact. Such does not bear on whether there was an adequate pre-suit inquiry.

Defendants cite *Ramos*, where this Court, in a footnote, indicated that claims that are not "warranted by existing law or by a nonfriovolous argument for extending, modifying,

3

or reversing existing law or for establishing new law" may result in the entry of Rule 11 sanctions". *Ramos v. S. Florida Express Bankserv, Inc*., 08-23382-CIV, 2009 WL 10667774, at *3 (S.D. Fla. Dec. 9, 2009). Although this Court in *Ramos* expressed its expectation that frivolous arguments not be raised, Defendants attempt to mislead this Court, and ignore the history of *Ramos*, where later on at summary judgment, this Court ruled "I find that there are material issues of fact with respect to whether Plaintiffs are employees or independent contractors that cannot be resolved upon summary judgment." *Ramos v. S. Florida Express Bankserv, Inc*., 08-23382-CIV, 2010 WL 11505845, at *4 (S.D. Fla. Nov. 4, 2010).

Defendants also cite *Palacio*, which held that "[g]iven Plaintiff's failure to adduce any supporting evidence for his FLSA claims at the summary judgment stage, it cannot be said that it was reasonable for Plaintiff's counsel to believe that there was factual support for these claims at the time the complaint was filed." *Palacio v. Empire Acad., Inc*., 15-21163-CV, 2016 WL 10568066, at *4 (S.D. Fla. Dec. 13, 2016), *report and recommendation adopted*, 15-21163-CIV, 2017 WL 5308334 (S.D. Fla. Mar. 13, 2017). However, in the case at bar, as set forth in [DE 51] and [DE 68] discussed in further detail below, there is significant evidence to argue that Plaintiff was an FLSA employee, and not an independent contractor under prevailing law.

*See also,* Rule 11, 1993 Advisory Committee Notes, Notes to Subdivision (b) and (c); *Morroni v. Gunderson et al.,* 169 F.R.D. 168, 171 (M.D.Fla.1996) ("[o]rdinarily the motion should be served promptly after the inappropriate paper is filed, and, if delayed too long, may be viewed as untimely ... Given the 'safe harbor' provisions ... a party cannot delay serving its Rule 11 motion until conclusion of the case...."). If the allegation in the Complaint was the "offending pleading to be corrected", then Defendants' Rule 11 Motion should have been served promptly after the Complaint was filed. *See, Oceanside Lauderdale, Inc. v. Ocean 4660, LLC,* No. 10-60025-CIV, 2011 WL 1327379, at *3 (S.D. Fla. Mar. 8, 2011), *report and recommendation adopted,* No. 10-60025-CIV, 2011 WL 1303133 (S.D. Fla. Apr. 5, 2011). According to the advisory committee notes following Rule 11, a motion for sanctions "should be served promptly after the inappropriate paper is filed." *Peer v. Lewis,* 606 F.3d 1306, 1313 (11th Cir.2010) (quoting Fed.R.Civ.P. 11, Advisory Committee Note to 1993 Amend.)). This case was

initially filed on 8/8/2017, and the Rule 11 Motion was not served until 3/27/18 (after the Parties both filed their summary judgment motions on 3/23/2018). Regardless, Defendants' Rule 11 Motion is baseless, as Plaintiff's pleadings in the Complaint alleging FLSA employer status was not frivolous.

**B. <u>PLAINTIFF WAS DEFENDANTS' "EMPLOYEE" UNDER THE FLSA</u>.**
<u>Yanel Martinez was an Individual FLSA Employer</u>.

The term "employer" ought be interpreted more broadly under the Act than common law for remedial purposes. *See, e.g., Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2nd Cir. 1999); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 965 (6th Cir. 1991), *citing McLaughlin v. Seafood, Inc.*, 867 F.2d 875, 877 (5th Cir. 1989); *Donovan v. Agnew*, 712 F.2d 1509, 1510 (1st Cir. 1983); *Falk v. Brennan*, 414 U.S. 190, 195 (1973). Multiple employers may be responsible for compliance with the FLSA within one business organization. *See*, *Elliott Travel & Tours, Inc.,* 942 F.2d at 965; *Agnew*, 712 F.2d at 1510. "[B]oth the employing corporation and the individual responsible for operation thereof may be employers for purposes of the FLSA." *Figueroa v. America's Custom Brokers, Inc.,* 48 F.Supp.2d 1372, 1377 (S.D. Fla. 1999), *citing Patel v. Wargo*, 803 F.2d 632, 638 (11th Cir. 1986). In the Eleventh Circuit, "[t]he overwhelming weight of authority is that a corporate officer with operational control of a corporation's covered enterprise is an employer along with the corporation, jointly and severally liable under the FLSA for unpaid wages." *Patel*, 803 F.2d at 637-38, *quoting Agnew*, 712 F.2d at 1511. *See,* [DE 68]. Financial control over a corporation is a significant factor in determining "employer" status. *See, Elliot Travel & Tours*, 942 F.2d 966 (6th Cir. 1991); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984)(imposing FLSA liability on a "top man" who guided corporate policies and controlled "purse strings"); *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190, 193-95 (5th Cir. 1983)(liability for controlling finances and dominating the administration); *Dole v. Simpson*, 784 F.Supp. 538, 545-47 (S.D. Ind. 1991). Liability may also be found even if control is restricted or exercised only occasionally as such does not diminish the significance of the existence of such control. *Herman*, 172 F.3d at 139, *quoting*, *Donovan v. Janitorial Servs, Inc.,* 672 F.2d 528, 531 (5th Cir. 1982). *See,* [DE 68].

Yanel was the one that terminated Plaintiff's working relationship. Yanel Deposition, P11, L8-25; P12. As to JR, APR and Midnight, Yanel multiple corporations "for insurance purposes", as the liability is too expensive to have a large number of trucks under a single corporation. Yanel Deposition, P59, L8-25. When discussing JR, APR and Midnight, Yanel closed down the operations of the companies and returned the equipment. Yanel was authorized to sign checks for those companies, and was the owner/president. Yanel was in charge of the day to day operations, had the most authority over the finances, had "the last word to hire new people", and would "stipulate" how much the worker "would get". Yanel said "[o]nly myself" when asked about decision-making as to the work "schedule". Yanel Deposition, P61-66. Yanel admitted to the facts showing he was an individual employer as to JR, APR and Midnight. As to United, Plaintiff refers to his arguments below citing *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. Ill. 1987) and other law. *See,* [DE 68].

As set forth in *See,* [DE 68], when asked if Plaintiff had "any direct supervisors" to "keep tabs on him", Yanel identified himself and Mr. Rivas the safety director. But Yanel testified that Mr. Rivas would "call me for any problem on my yard." Yanel said "[y]eah" that he would check that there were "no problems" when asked if he talked to Plaintiff about his "job functions". Yanel communicated with Plaintiff via telephone daily. Yanel Deposition, P77, L3-13. Rivas was Defendants' "employee". Yanel Deposition, P85, L9-12. Plaintiff states in his Affidavit that: "Management, including Yanel Martinez, Eduardo Rivas and Danny Padron, exercised control over my employment, which included my schedule, payment and duties", and "Yanel hired and fired me, and dictated my hours. Also, the named Defendants signed my checks. Yanel had broad operational control over the entire company, but on a nightly basis, I was mostly controlled by Danny Padron, the night dispatcher. He would tell me where to be, what trucks were arriving and departing and which drivers needed gas cards." Plaintiff states in his Affidavit that "I would regularly have to report all activities to company management and I was not responsible for making any decisions concerning the administration or operation of Defendants' businesses. I often had to correspond with Yanel with respect to any work related issues. For instance, once, a driver did damage to the surrounding fence while backing his truck out. I called Yanel and told him what

6

happened. Later that night a van came stating that they were there to fix the fence. I sent a picture of the van to Yanel in order to confirm the van's entrance into the yard. Additionally, after heavy rains one night, I sent pictures of the flooded yard to Yanel. Before handing out gas cards to drivers, I had to send a picture of the driver to dispatch in order to confirm that they were scheduled to depart." *See,* [DE 68].

**The Entity Defendants were Plaintiff's FLSA Joint Employers; Plaintiff was not an Independent Contractor; there are Grounds to Find Successor Liability.**

Defendant Yanel's active role and control discussed *supra*, shows an employment relationship under the economic realities test. Plaintiff worked for all of the entity Defendants (herein individually "Midnight", "JR", and "APR"), except Yanel denies Plaintiff worked for United Transport Logistics, Inc. ("United"). Plaintiff worked at the "8501 Northwest" address. Defendant identified another company he owns, ("UTL, Inc.") who is not a party in this matter.[1] Yanel Deposition, P5, L18-25; P6; P8. *See,* [DE 68].

The relevant claim period alleged is 9/9/14-7/28/17. *See*, [DE 6]. During the relevant period, Yanel admitted Plaintiff was performing services for Midnight Xpress, JR Trucks and APR. Yanel Deposition, P12, L16-19. Later Yanel stated "not at all" when asked if Plaintiff worked for UTL, Inc. Yanel Deposition, P17, L23-25, P18.[2] As indicated by the filed composite exhibit, Plaintiff received paystubs for his work for

---

[1] It is notable that UTL, Inc. could be an acronym for United Transport Logistics, Inc., although they are different corporations and Defendant Yanel is not listed on the Sunbiz record for United Transport Logistics, Inc. Yanel testified that Plaintiff however did not work for UTL, Inc. Yanel Deposition, P8, L18-25.

[2] Yanel admitted Plaintiff was working back in 2014 for Defendant Midnight. Yanel Deposition, P16. *See also*, Yanel Deposition, P14 *et seq*. regarding Division of Corporations records. As indicated by the filed Division of Corporations records, Midnight was incorporated in 2005 (and still listed as "Active" as of 2/16/18 when the internet search was conducted). APR was incorporated in 2009 (and still listed as "Active" as of 2/16/18). APR was incorporated in 2009 (and still listed as "Active" as of 2/16/18). As indicated by [DE 21] filed by Defendants on 11/3/17: JR was incorporated ("Effective Date") on 3/10/15 and became "Inactive" on 3/14/17; and United was incorporated ("Effective Date") on 4/23/15 and remained "Active" as of 11/3/17 when [DE 21] was filed. Therefore, Midnight and APR were active corporations during the entire relevant period alleged 9/9/14-7/28/17, and during such time JR was active from 3/10/15-3/14/17 during the relevant period, and United 4/23/15-7/28/17 during the relevant period.

7

Midnight Xpress, JR Trucks, APR <u>and</u> United. This goes to prong 5 of *Layton*, *infra*, and importantly shows joint employment of Plaintiff by ALL of the Defendants who paid Plaintiff's wages.[3] Plaintiff's Affidavit states: "Throughout my employment, I was always paid similarly, no matter what the name of the company was. Yanel or Anatella signed the checks that I was given weekly, normally in the amount of $1,080.00. I often did not even recognize that the name of the company had changed, I only confirmed that the check, no matter who it was from, was signed. Whenever the name of the company would change, my duties never changed and my payment never changed." *See,* [DE 68].

An employee, as defined by 29 U.S.C. § 203(e)(1), is any individual employed by an employer. An employer includes any person acting directly or indirectly in the interest of an employer in relation to the employee. 29 U.S.C. § 203(d). An employment relationship is decided by applying the "economic realties test." *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1319 (D. Fla 2001). In applying the "economic realities test," the Court should consider the following factors: (1) the nature and degree of control of the workers by the alleged employer; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skills; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of helpers; (4) whether the service rendered required a special skill; (5) the degree of permanence of the working relationship; and (6) whether the service rendered is an integral part of the alleged employer's business. *See, Santelices, supra.* As to joint employer, similarly and economic realities analysis is used, s*ee*, *Layton v. DHL Express, Inc.*, 686 F.3d 1172, 2012 U.S. App. LEXIS 13978, (11th Cir. 2012).[4] The similar factors outlined in *Layton v.*

---

[3]All of the paystubs are in the same format, except that the name of the Defendant varies. Various paystubs show total payment in the amount of "$1,080" (for example see United stub dated 1/22/16 and Midnight stub dated 7/10/15, along with other stubs filed concerning the various corporate Defendants). *See,* [DE 68].

[4]In *Jeanneret v. Aron's East Coast Towing*, 2002 U.S. App. Lexis 27699 (11th Cir. 2002), the Appellate Court affirmed the District Court's definition of an employer and employee under the FLSA. "Section 203(d) of the FLSA defines an "employer" as 'any person acting directly or indirectly in the interest of an employer in relation to an employee.' It further defines 'employee' as 'any individual employed by and employer.'" *Id*. at 6. "To 'employ' means 'to suffer or permit to work." Id. The court states that a determination of employment status under the FLSA is a question of federal law. *Id*. Whether an employment relationship exits under the FLSA must be judged by the 'economic

*DHL Express, Inc.*, 686 F.3d 1172, 2012 U.S. App. LEXIS 13978, (11th Cir. 2012) concerning joint employment include:  (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power to determine the pay rates or the methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; (5) preparation of payroll and the payment of wages; (6) ownership of the facilities where work occurred, and (7) performance of a specialty job integral to the business.  With respect to factor (8), investment in equipment and facilities, the court deems "irrelevant if one were comparing the investment by the workers versus the land owner." *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1176 (11th Cir. 2012).  *See,* [DE 68].

Plaintiff was paid by check.  Yanel Deposition, P52.  Plaintiff's job was to guard whatever was in the yard, including "**United, Midnight, JR, APR**" etc.  Plaintiff would guard "[w]hatever is in the yard." Yanel Deposition, P55, L4-15 (emphasis added). Plaintiff received paystubs [DE 48] for his work for **United, Midnight, JR,** and **APR.** This goes to prong 5 of *Layton*, *supra*, and importantly shows joint employment of Plaintiff by ALL of the Defendants who paid Plaintiff's wages.  Defendant Yanel admitted "I gave the contract to him." Yanel Deposition, P56, L4-8.  Thus, Yanel admitted it was <u>he that contracted with Plaintiff</u> to guard whatever was in the yard.  Yanel also admitted that other companies (i.e other companies that were parking their trucks in the yard) were not paying Defendants to use the yard.  Yanel said (regarding the other companies) that he "was helping my friend" and was not making a profit as to those other companies.  Yet, Plaintiff's job entailed "guarding the whole yard." Yanel Deposition, P56, L24-25; P57; P58.

As set forth in [DE 68], in *Jeanneret v. Aron's E. Coast Towing*, 2002 U.S. Dist. LEXIS 12200, 19-20 (S.D. Fla. 2002)(emphasis added), this Court noted that part of the inquiry concerns "whether the putative employer was involved in the preparation of payroll and the payment of wages to the workers. *See id*. According to the *Antenor* Court,

---

realities' of the individual case and not by traditional common-law principles. *Id*. Economic dependence determines the employer/employee relationship under the Act. See, *Apolinar Martinez-Mendoza et.al. v. Champion International Corporation*, 16 Fla. L. Weekly Fed. C945, (11th Cir. 2003), regarding economic dependence.

9

this factor is probative of joint employment because of the likelihood that "when a business undertakes to help an independent contractor (in this case, Aron's) prepare its payroll and pay its wages, it is likely that the **contractor lacks economic substance** on which the workers can solely depend."[5] *See Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996)(emphasis added). Plaintiff was paid by the Defendants (including United) [DE 48], and all of his work was for Defendants' business, and that was what Defendant Yanel hired and paid Plaintiff to do. Plaintiff received the same type paystubs in the same manner for his work for **United, Midnight, JR,** and **APR** [DE 48]. This goes to prong 5 of *Layton*, *supra*, and importantly shows joint employment of Plaintiff by ALL of the Defendants who paid Plaintiff's wages.[6] As to JR, APR and Midnight, Yanel said he used multiple corporations "for insurance purposes", as the liability is too expensive to have a large number of trucks under a single corporation. Yanel Deposition, P59, L8-25. Defendants are trying to isolate themselves from liability regarding payments made to Plaintiff on United paystubs (notwithstanding that Plaintiff was simply being paid for the same work he normally did for Defendants on Defendants' premises). This goes to prong 5 of *Layton*, *supra*, and importantly shows FLSA employment of Plaintiff by United who paid Plaintiff's wages. *See* 29 U.S.C. § 203(d) (employer within the meaning of the Act includes "any person acting directly or indirectly in the interest of an employer in relation to an employee"). *See also*, *Patel v. Wargo*, 803 F.2d 632, 637-

---

[5]Plaintiff acknowledges the Court's rulings in its dismissal Order, and is thus not raising "joint employer" arguments. However, as with joint employment, the issue of independent contractor versus FLSA "employee" also requires application of the economic realities test.

[6]Plaintiff's Affidavit, see [DE 51], states the following regarding the checks he was given weekly, that were normally in the amount of $1,080.00: "I often did not even recognize that the name of the company had changed, I only confirmed that the check, no matter who it was from, was signed. Whenever the name of the company would change, my duties never changed and my payment never changed." Plaintiff's Affidavit states that "I am aware that, according to the Florida Secretary of State, Jose Jarquin is mentioned as the President of United Transport Logistics Inc., but, again, when that company was my employer, as with all of the other corporate defendants, all aspects of my employment remained the same. Jose was not my boss, nor did he control any aspects of my employment. To my knowledge, he is the company electrician. My United pay stubs, save for the name at the top, were identical to those of APR, JR and Midnight. No matter the company name, throughout my employment, I was paid the same rate, for the same work, and was controlled by the same people."

38 (11th Cir. 1986); *Koster v. Chase Manhattan Bank*, 554 F. Supp. 285, 290 (S.D.N.Y. 1983). *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. Ill. 1987). *Riordan* stated that "[t]he word "employer" is defined broadly enough in the Fair Labor Standards Act (of which the Equal Pay Act is an amendment) to permit naming another employee rather than the employer as defendant, provided the defendant had supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation." *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987). In light of Defendant Yanel's dominating financial and operational control set forth above (*see also* section above regarding individual FLSA employer liability) in relation to Plaintiff's job and all of the companies in relation to Plaintiff's pay, the Court should reject any attempts by Defendants to avoid liability as it relates to payments (lacking overtime remuneration) to Plaintiff on United paystubs. *See,* [DE 68], also regarding Jose Galindo and how Defendant Martinez arranged for them to cover 108 hours of work for Defendants. After one of Defendant's managers fired Galindo, Plaintiff had to find other people to cover some of the weekly 108 hours. *See*, Plaintiff's 3/29/18 Affidavit. This goes to prongs 3 and 4 of *Layton*, *supra*, and importantly shows it was Defendants' management exercised authority over the rate of pay and hours, and would fire the security guards. Plaintiff's Affidavit further states that "Yanel hired and fired me…." Yanel was asked a profit/loss line of questioning as to whether Plaintiff through managerial activities could earn additional money; however, Yanel confirmed Plaintiff was always paid the same contracted rate.[7] Yanel Deposition, P82, L14-25; P83, L1-7. Defendants cannot argue that Plaintiff waived his rights to overtime. *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728 (U.S. 1981). *See,* [DE 68].

        Defendants seem to argue the issue with helpers is dispositive. However, such is not the case. In *Artola v. MRC Express, Inc.*, 14-23219-CIV-SEITZ, [DE 46], (S.D. Fla. 9/25/15), at 7 (filed in support of *See,* [DE 68]), this Court found that the plaintiff (a driver) obtained "helpers", including his wife as a helper. Also, that plaintiff could work

---

[7]Plaintiff states in his Affidavit, *see* [DE 51], that: "During the relevant time period, I was not required to generate profit or loss through performance of managerial skills. I had no opportunity in my position to increase/maximize my income through any type of loss/profit structure. I did not supervise anyone and had no management duties of any kind." Such goes to prong 2 of the economic realities test set forth in *Santelices, supra.*

for other companies. *Id*. at 7, 12. In addition, in *Artola* the drivers were responsible for their insurance coverage and all expenses (even had to pay for their helpers' drug tests). *Id*. at 8. Also the plaintiff in *Artola* had his own corporation that the defendants paid, and he declared business deductions as a 1099. *Id*. at 8. *Artola* did not grant summary judgment as to independent contractor status, and thereafter set the matter for trial. *Id*. at 25 *et seq*. Interestingly, this Court in *Artola* found that "[m]ost courts appear to separate this factor [i.e. opportunity for profit and loss] from the worker's employment of others, and instead consider the employment of others as part of the investment analysis." *Id*. at 17. As argued in [DE 68], in the case at bar, Plaintiff Dimingo did not invest regarding the helpers. For example, unlike *Artola*, Plaintiff Dimingo did not pay for helpers' drug tests. Rather, in the case a bar, after one of Defendant's managers fired Galindo, Plaintiff had to find other people to cover some of the hours as a total of 108 hours needed covered per week. *See*, Plaintiff's 3/29/18 Affidavit. Plaintiff was not, for example, like a specialized construction subcontractor (paid by a general contractor), who was paid per square foot, and who could suffer loss if he made miscalculations regarding labor and material costs. With respect to prong (5) under *Santelices*, the relevant claim period alleged in this matter is 9/9/14-7/28/17, and such shows a significant degree of permanence of the working relationship.[8] *See,* [DE 68].

When asked if Plaintiff had "any direct supervisors" to "keep tabs on him", Yanel identified himself and Mr. Rivas the safety director. But Yanel testified that Mr. Rivas would "call me for any problem on my yard." Yanel said "[y]eah" that he would check that there were "no problems" when asked if he talked to Plaintiff about his "job functions". Yanel confirmed that he would communicate with Plaintiff via telephone on a daily basis. Yanel Deposition, P77, L3-13. Yanel admitted that the yard was "my yard", and such goes to prong 6 of *Layton*—the facilities where Plaintiff worked were Defendants' facilities, and were never Plaintiff's facilities or property. Plaintiff merely

---

[8]Regarding the special skill prong, Plaintiff's security background and licenses are a single factor that goes towards Defendants' argument; however, the Court should reject Defendants' arguments regarding the Class B licenses on Pages 9-10 of their Motion. Defendants have pointed to nothing under Florida law that indicates Plaintiff was an "independent contractor" as a matter of law. The facts in the instant matter show that Plaintiff worked solely for Defendants for a significant amount of time, and that Plaintiff was financially dependent on Defendants for his livelihood. *See,* [DE 68].

worked at Defendants' facilities.  Rivas was Defendants' "employee".  Yanel Deposition, P85, L9-12.   Plaintiff states in his Affidavit that: "Management, including Yanel Martinez, Eduardo Rivas and Danny Padron, exercised control over my employment, which included my schedule, payment and duties."  Plaintiff's Affidavit further states that "Yanel hired and fired me, and dictated my hours. Also, the named Defendants signed my checks. Yanel had broad operational control over the entire company, but on a nightly basis, I was mostly controlled by Danny Padron, the night dispatcher. He would tell me where to be, what trucks were arriving and departing and which drivers needed gas cards."  Such goes to prong 1 of the economic realities test set forth in *Santelices* and *Layton, supra.  Also see Usery v. Pilgrim Equipment* , 527 F.2d  1308, (5th Cir. 1976)."

Plaintiff states in his Affidavit, *see* [DE 51], that "I would regularly have to report all activities to company management and I was not responsible for making any decisions concerning the administration or operation of Defendants' businesses. I often had to correspond with Yanel with respect to any work related issues.  For instance, once, a driver did damage to the surrounding fence while backing his truck out. I called Yanel and told him what happened. Later that night a van came stating that they were there to fix the fence. I sent a picture of the van to Yanel in order to confirm the van's entrance into the yard. Additionally, after heavy rains one night, I sent pictures of the flooded yard to Yanel. Before handing out gas cards to drivers, I had to send a picture of the driver to dispatch in order to confirm that they were scheduled to depart."  Such goes to prong 1 of the economic realities test set forth in *Santelices* and *Layton, supra.*   Such evidence also shows Yanel was an individual FLSA employer, and Plaintiff was an employee of Yanel and the companies that paid Plaintiff.  Plaintiff states in his Affidavit, see [DE 51] that: "Beyond providing nighttime security services, I was tasked by management with a number of other integral tasks, including but not limited to; handing out gas cards to drivers and signing truck intake/exit forms."  Such is very important as Defendant was using Plaintiff's labor for non-security guard tasks in addition to his security tasks.  Such goes to prong 6 of the economic realities test set forth in *Santelices* and prong 7 of *Layton, supra.  See,* [DE 68].  On Page 11-12 of their Sanctions Motion [DE 72], Defendants even admit the services provided by Plaintiff "Were an Integral Part of Defendants' Business."   However, Defendants claim that such "of course, is only one

factor for the Court to consider….." [DE 72], Page 12.  Plaintiff states that such is one of the various factors (under the economic realities test) that show the FLSA employment relationship in this case.

As set forth in his Affidavit, see [DE 51], Plaintiff states "I started working for Defendants on or about 9/9/14, and worked for Defendants up and until about 7/28/17.  I had no other jobs while employed by the Defendants and I was completely economically dependent on the Defendants for my livelihood, as I had no other source of income."  Furthermore, economic dependence determines the employer/employee relationship under the Act.  See, *Apolinar Martinez-Mendoza et.al. v. Champion International Corporation*, 16 Fla. L. Weekly Fed. C945, (11th Cir. 2003)-the Eleventh Circuit stated at HN13 that "in entertaining and assessing the evidence relevant to the inquiry called for by a given factor, the question the district court must ask itself is whether such evidence, considered as a whole, supports (or fails to support) the laborer's claim that he is economically dependent on the putative employer."  *See,* [DE 68].

As set forth in [DE 51], the relevant claim period alleged in this matter is 9/9/14-7/28/17.  *See*, [DE 6].  Yanel admitted Plaintiff was working back in 2014 for Defendant Midnight.  Yanel Deposition, P16.  Midnight and APR were active corporations during the entire relevant period alleged 9/9/14-7/28/17, and during such time JR was active from 3/10/15-3/14/17 during the relevant period, and United 4/23/15-7/28/17 during the relevant period.[9]   Plaintiff also refers to [DE 68], regarding arguments regarding *Steinbach v. Hubbard*, 51 F.3d 843, 846 (9th Cir. 1995) and related case law, concerning the issue of "successor liability".

As set forth in [DE 68], Defendants appear to admit they have no basis to argue the *in pari delicto* defense.  Eleventh Circuit case law such as *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1309 (11th Cir. 2013) also shows such

---

[9] *See also*, Yanel Deposition, P14 *et seq*. regarding Division of Corporations records.  As indicated by the filed Division of Corporations records, Midnight was incorporated in 2005 (and still listed as "Active" as of 2/16/18 when the internet search was conducted).  APR was incorporated in 2009 (and still listed as "Active" as of 2/16/18).  APR was incorporated in 2009 (and still listed as "Active" as of 2/16/18).  As indicated by [DE 21] filed by Defendants on 11/3/17: JR was incorporated ("Effective Date") on 3/10/15 and became "Inactive" on 3/14/17; and United was incorporated ("Effective Date") on 4/23/15 and remained "Active" as of 11/3/17 when [DE 21] was filed.

arguments should not be entertained in the case at bar.[10] Defendants appear to raise a factually baseless and legally frivolous argument in that section of their summary judgment motion. Yet, in the [DE 72] they raise the argument again at Page 12 and claim such is a basis to sanction Plaintiff and Counsel. As set forth in [DE 68], Plaintiff's Affidavit dated 3/29/18 testifies that Plaintiff at no time relevant to this lawsuit has ever sought overtime damages related to hours worked by other covering security guards. *See* Para. 12 of Plaintiff's responsive Statement of Material Facts filed in support of [DE 68]. The fact that Defendants mention the issue of "credibility" (see Page 12 of [DE72]), further underscores the specious nature of Defendants' arguments. Credibility is an issue for the Jury to weigh.[11] Also, in *Harrell v. Diamond A Entertainment, Inc.*, 992 F. Supp. 1343 (M.D. Fla. 1997)(emphasis added), the Middle District of Florida stated that "Defendant's fourth and fifth additional factors (characterization for **tax** purposes and the provision of employee benefits) **are not relevant**. The Court should decide such factors in the context of the broad "suffer or permit to work" definition of employment contained in the FLSA."

### C. THE COURT'S INHERENT AUTHORITY AND 28 U.S.C. § 1927.

In FN3 of their Motion, Defendants allege that "If Plaintiffs do withdraw these claims prior to the expiration of the 21-day safe harbor provision of Rule 11, Defendants nevertheless intend to seek full recovery of their attorney's fees under alternative

---

[10] In *Lamonica* with respect to taxes, the Eleventh Circuit found "[t]hey further argue that both Feliciano's and Milan's recoveries should be barred because their tax violations are "connected with the matter in litigation." However, both of these arguments misstate the test to be applied under *Bateman Eichler*. Not just any causal relationship or topical connection will do." *Lamonica v. Safe Hurricane Shutters, Inc.*, 711 F.3d 1299, 1309 (11th Cir. 2013).

[11] Plaintiff reserves all arguments he may raise *in limine*, and is not waiving same. The Eleventh Circuit's Pattern Jury Instructions includes Instruction "3.4 Credibility of Witnesses", which, *inter alia*, states that the jury "should decide whether you believe what each witness had to say, and how important that testimony was. In making that decision you may believe or disbelieve any witness, in whole or in part. The number of witnesses testifying concerning a particular point doesn't necessarily matter (emphasis added)." Analogously, in a case involving credibility concerning alleged wages owed, the Eleventh Circuit held in *Medrano* that "in determining that the employment records were adequate, the district court improperly weighed evidence, made credibility determinations, and resolved factual disputes that should have been left to the jury." *Medrano v. The Inv. Emporium LLC*, 167 Lab. Cas. P 36493 (11th Cir. 2016).

provisions, including this Honorable Court's inherent authority, 28 U.S.C. § 1927, and *Christianburg Garments Co.* v. EEOC."

As noted by the Eleventh Circuit in *Amlong*, the requirement of imposing sanctions pursuant to 28 U.S.C. §1927 requires a higher standard.   See *SEC v. Creative Capital Consortium, LLC*, 2009 U.S. Dist. LEXIS 116312 (S.D. Fla. Nov. 24, 2009) citing *Byrne v. Nezhat,* 261 F.3d 1075, 1106 (11th Cir. 2001) (quoting *Chambers v. NASCO*, Inc., 501 U.S. 32, 43, 111 S. Ct. 2123, 115 L. Ed. 2d 27 (1991)). However, as cited in *SEC*, "[b]ecause the court's inherent power is so potent, it should be exercised 'with restraint and discretion.'" *Byrne*, 261 F.3d at 1106 (*citing Chambers,* 501 U.S. at 50)." Id at. *13. The Court's inherent power requires a finding of bad faith." *Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998).  *See also, In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995); *Rothenberg v. Sec. Mgmt Co., Inc.,* 736 F.2d 1470, 1472 (11th Cir. 1984).

The legal authority on whether to tax attorney fees against a non-prevailing plaintiff and his/her counsel in an FLSA context is *Kreager v. Solomon & Flanagan, P.A.*, 775 F.2d 1541 (11th Cir. 1985.).  According to *Kreager* and *Alyeska Pipeline*, attorney fees may be awarded to a prevailing party if the non-prevailing party conducted the litigation in a bad-faith, vexatious, or oppressive manner. *See Alyeska Pipeline* at 258. This standard has also been applied for ADEA cases as well as the FLSA. *Turlington v. Atlanta Gas Light Company*, 135 F.3d 1428  (11th Cir. 1998).

In *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412 (1978), the Supreme Court stated in a Title VII context that it is important for "a district court [to] resist the understandable temptation to engage in post hoc reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation."  There is a definite distinction to be drawn between losing a summary judgment motion and being accused of vexatious litigation.  *See also* bad faith analysis in *Monk v. Roadway Express, Inc*., 599 F.2d 1378, 1382-83 (5th Cir. 1979); *Loftus v. Southeastern Pennsylvania Transportation Authority*, 8 Fed.Supp. 2d 458; 1998 U.S. Dist. LEXIS 6650 (E.Dist. Pa. 1998).  Further, a number of courts have cautioned, however, that the power to impose sanctions "should be exercised with restraint, lest the prospect chill the ardor of proper and forceful advocacy on behalf of [the] client."). *See, Lino L. Alphonso v. Pitney Bowes, Inc. and Norm Somme*r, 356 F. Supp. 2d. 442  (Dist.

N.J. 2005). For the legal and factual reasons as detailed above relevant to the arguments made in the summary judgment pleadings, the Plaintiff's and Counsel's conduct in this case was not in bad-faith, vexatious or oppressive. *See*, [DE 51], [DE 68], and [DE 71]. Sanctions imposed under Section 1927 and the Court's inherent authority require meeting a higher standard than Rule 11. As stated, Plaintiff and Counsel intend to seek sanctions against Defendants and defense Counsel for their frivolous Motion for Sanctions.

WHEREFORE, PLAINTIFF AND COUNSEL REQUEST THE COURT DENY DEFENDANTS' MOTION.

**Respectfully submitted,**

**K. DAVID KELLY, ESQ.**
**J.H. ZIDELL, P.A.**
**ATTORNEY FOR PLAINTIFFS**
**300 71ST STREET, #605**
**MIAMI BEACH, FLA. 33141**
**PH: 305-865-6766**
**FAX: 305-865-7167**
**EMAIL: DAVID.KELLY38@ROCKETMAIL.COM**
**F.B.N. 0123870**

BY:_____/s/ K. David Kelly_____
K. DAVID KELLY, ESQ.

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY THAT A TRUE AND CORRECT COPY OF THE FOREGOING WAS SENT SUBSEQUENT TO E-FILING ON 4/30/18 TO:**

**ALL CM/ECF RECIPIENTS**

**JORDAN LEE RICHARDS, ESQ.**
**JORDAN RICHARDS, PLLC**
**401 EAST LAS OLAS BLVD.**
**SUITE 1400**
**FORT LAUDERDALE, FL 33301**

BY:__ /s/ K. DAVID KELLY _____
K. DAVID KELLY, ESQ.