United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Eduardo E. Dimingo, Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 17-23010-Civ-Scola |
| | ) |
| Midnight Xpress, Inc. and others, Defendants. | ) |

### Omnibus Order on Motions for Summary Judgment

This matter is before the Court upon Plaintiff Eduardo E. Dimingo's ("Dimingo") motion for partial summary judgment and the Defendants' motion for summary judgment. Upon review of the record, the parties' briefs, and the relevant legal authorities, the Court **grants** the Defendants' motion **(ECF No. 54)** and **denies** Dimingo's motion **(ECF No. 51)**.

### I. Background

This case arises from a work relationship that existed between Dimingo and the Defendants from September of 2014 to July of 2017. The Defendants are four corporate defendants, Defendants Midnight Xpress, Inc. ("Midnight"), JR Trucks Corp. ("JR Trucks"), APR Trucking, Inc. ("APR Trucking"), United Transport Logistics, Inc. ("United"), and Yanel Martinez, Sr. ("Martinez").[1] Martinez was the owner and president of three of the corporate defendants, Defendants Midnight, JR Trucks, and APR Trucking during the relevant period. (Defendants' Statement of Material Facts ("Defendants' SMF") ¶ 4, ECF No. 53.) The parties, however, dispute Martinez's involvement with United and Dimingo's relationship with United. Each of the corporate defendants was incorporated at different times, and while Midnight and APR Trucking were active entities during the entire relevant period, JR Trucks and United were only active for part of the period. (Dimingo's Statement of Material Facts ("Dimingo's SMF") ¶ 3, ECF No. 50.)

Dimingo provided security services for the Defendants at a parking yard where the Defendants' tractors and trailers were parked before and after they were used for cargo shipments. Dimingo secured the premises, guarded the vehicles and the relevant cargo, ensured that the drivers were parking correctly, shut down the engines, locked up the tractors and trailers, and

---

[1] This Court dismissed Dimingo's claims against Anatella Martinez without prejudice. (Order, ECF No. 96.)

reduced damage to the vehicles. (Defendants' SMF ¶ 21, ECF No. 53.) Dimingo was scheduled to provide security services seven days a week. He was usually paid $1,080.00 a week by one of the corporate defendants. (*See* Dimingo's SMF at ¶ 10, 11, 21.) However, Dimingo paid several other people $10.00 an hour to cover for him at the yard and paid them from the sums he received from the corporate defendants. (*See* Defendants' SMF ¶ 68, 70, ECF No. 53.)

Dimingo's First Amended Complaint alleges that the Defendants owe him overtime wages under the Fair Labor Standards Act, 29 U.S.C. § 201, *et. seq.* (Compl., ECF No. 26.) Although Dimingo attempted to allege individual coverage and enterprise coverage, per the Court's order on the Defendants' motion to dismiss Dimingo's First Amended Complaint, Dimingo can only proceed under an individual coverage theory. (Order, ECF No. 32.)

Upon completion of discovery, the parties filed the present motions. The parties essentially seek the opposite legal determinations on the main issues in this case. The parties dispute: (1) whether there is individual coverage under the FLSA; (2) whether Dimingo was an employee or independent contractor; (3) whether the corporate defendants were joint employers and Martinez was an individual employer; and (4) whether certain FLSA exemptions apply.

## II.     Legal Standard

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56. "The purpose of summary judgment is to isolate and dispose of factually unsupported claims or defenses." *Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1316 (S.D. Fla. 2001) (Jordan, J.).

In reviewing a motion for summary judgment, the Court must "view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." *Feliciano v. Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1143 (11th Cir. 2007)). The moving party bears the burden of proof to demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. However, "the mere existence of a scintilla of evidence in support" of the non-moving party's position is insufficient to deny summary judgment. *Santelices*, 147 F. Supp. 2d at 1317 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

### III.   Analysis

Before turning to the parties' FLSA arguments, the Court addresses the Defendants' arguments that Dimingo submitted two sham affidavits and failed to properly admit or deny the facts they asserted in their statement of uncontested facts.

### A. Dimingo's Affidavits

Dimingo filed two separate affidavits in support of his summary judgment briefing. Dimingo's first affidavit was filed in conjunction with his motion for partial summary judgment (ECF No. 48-2), and his second affidavit (ECF No. 63-1) in response to the Defendants' motion for summary judgment. The Defendants insist that the affidavits should be disregarded because they contradict Dimingo's prior deposition testimony and discovery responses.

District courts may disregard sham affidavits when evaluating summary judgment motions. *See Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 656 (11th Cir. 1984); *Bank of Am., NA v. Louis*, No. 8:11–cv–1745–T–27EAJ, 2012 WL 12905987, at * 3 (M.D. Fla. Dec. 20, 2012) ("A review of the record including written discovery, pleadings, and deposition testimony, demonstrate that the Affidavit . . . is at best, a belated attempt to avoid summary judgment . . . by manufacturing factual disputes which are not supported by, and inconsistent with, the record."). The Eleventh Circuit has held that "a district court may find an affidavit which contradicts deposition testimony a sham when the party merely contradicts its prior testimony without giving any valid explanation." *Van T. Junkins*, 736 F.2d at 656. "When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." *Id.* at 657. However, the Court must be aware of the difference between sham affidavits and affidavits that have "discrepancies which create an issue of credibility or go to the weight of the evidence." *Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). In doing so, this Court must evaluate whether there is an unexplained "irreconcilable conflict" between Dimingo's prior testimony and the statements in the affidavits. *Id.* at 954–55.

The Defendants insist that Dimingo's affidavits should be disregarded because they contradict his prior discovery responses and deposition testimony, and are at times internally inconsistent. Aside from fleeting

references to the Defendants' argument, Dimingo does not address the inconsistencies pointed out by the Defendants. Nonetheless, the Court cannot blindly conclude that the Defendants' assertions are true. Upon review of the record and the submitted affidavits, the Court finds that only certain of the statements made in Dimingo's affidavits present irreconcilable conflicts. As a result, the Court will only disregard the affidavits to the extent they present contradictory statements that cannot be reconciled with Dimingo's prior testimony or discovery responses.

For example, the Defendants take issue with paragraphs four and seven of Dimingo's first affidavit (ECF No. 48-2). (Defendants' Resp., ECF No. 68 at 3–4.) In paragraph four, Dimingo asserts that he "had no other jobs while employed by the Defendants and [ ] was completely economically dependent on the Defendants for [his] livelihood, as [he] had no other source of income." The evidence the Defendants cite as contradictory, however, reflects only that Dimingo admitted that he could have obtained another job while working for the Defendants, that his tax returns for the relevant years included information related to a company he used to be an officer of, and that Dimingo was unaware of a 2015 property deed with his signature on it. This evidence does not inherently conflict with Dimingo's assertion that he had no other employment or income while working for the Defendants.

Similarly, the Defendants' claim that Dimingo's statement in paragraph seven that he "would regularly have to report activities to company management and [ ] was not responsible for making any decisions concerning the administration or operation of Defendants' business," ECF No. 48-2, is contradicted by Dimingo's prior admission that he was not physically supervised and that he could direct the truck drivers as necessary to protect the trucks and freight. (*See, e.g.,* ECF No. 66-2, Req. No. 19, ECF No. 66-1, Req. Nos. 3, 4.) That evidence is not inherently inconsistent. Dimingo could have been reporting to management via telephone, as he attests in his briefing, and the fact that he could direct the truck drivers does not necessarily conflict with his statement that he was not responsible for making decisions "concerning the administration or operation of Defendants' businesses."

This is also true for the issues pointed out by the Defendants with paragraph six of Dimingo's first affidavit. (Defendants' Resp., ECF No. 68 at 5–6.) His prior admission that no one physically supervised him does not conflict with his statements that Martinez and another individual, Danny Patron, had some control over him. (Dimingo's First Aff. ¶ 6, ECF No. 48-2.) Further, Dimingo's prior discovery response in which he designated the percentage of time he spent on each of his work tasks and failed to mention handing out gas cards is not directly contradictory with the new assertion in his affidavit that

he also handed out gas cards. *Id.* at ¶ 8. This inconsistency, rather, goes more appropriately to Dimingo's credibility.

The Court also rejects Defendants' argument that Dimingo's first affidavit includes inadmissible hearsay in paragraphs six and thirteen because the statements allegedly made by others are not necessarily being relied upon to prove the truth of the matters asserted. *See* Fed. R. Evid. 801(c)(defining hearsay); Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.").

The closest example of an "irreconcilable conflict" is the information presented in paragraph nine of Dimingo's first affidavit, which states that he was "not required to generate profit or loss through performance of managerial skills . . . [and] did not supervise anyone and had no management duties of any kind." (Dimingo's First Aff. ¶ 9, ECF No. 48-2.) The Defendants claim that this is contradicted by evidence that Dimingo hired at least six individuals, determined their wages, paid them, and set their schedules. (Resp., ECF No. 68 at 6.) The Court concludes that the Defendants have not provided sufficient evidence to demonstrate that Dimingo's statements about generating profits or having the opportunity to maximize his income through a type of loss/profit structure are contradicted by his deposition testimony or his discovery responses. However, Dimingo's statement that he "did not supervise anyone or have any managerial duties of any kind," is irreconcilable with the evidence that Dimingo found other people to cover his shifts and paid them. The Court also agrees that Dimingo's prior statements about who signed his checks conflicts with his affidavit. (Defendants' Resp., ECF No. 68 at 3–4.)

In their reply in support of their motion for summary judgment, the Defendants also take issue with certain portions of Dimingo's second affidavit (ECF No. 63-1). The Court agrees that certain statements directly contradict Dimingo's prior discovery responses without explanation and should therefore be disregarded. For instance, Dimingo previously admitted to having time to work elsewhere during the workweek, *see* ECF No. 66-2, Req. No. 14, and now claims that he had no time to work anywhere else given the number of hours he had to cover. (Dimingo's Second Aff. ¶ 27, ECF No 63-1.)

Two other examples cited in the Defendants' reply do not present such an "irreconcilable conflict." First, although the Court agrees that Dimingo's statement that he worked from 7:00 *a.m.* to 7:00 *p.m.* from Monday through Friday, *see id.* at ¶ 6, conflicts with his prior admission that he worked from 7:00 *p.m.* to 7:00 *a.m.* during the workweek, *see, e.g.,* ECF No. 66-2, Req. No. 11, and should therefore be disregarded, his weekend schedule can be

reconciled with other evidence in the record that he was expected to provide security services from 7:00 a.m. Saturday morning to 7:00 a.m. Monday morning. Similarly, while the Defendants point to evidence in the record where Dimingo admitted to "hiring other individuals to provide security services he was hired to provide," ECF No. 66-2, Req. No. 15, which directly contradicts his statement that these individuals were never his employees, *see* ECF No. 63-1 at ¶ 9, there is other evidence in the record that indicates that Dimingo also testified that he did not "hire" these individuals. Accordingly, the Court finds that this affidavit statement does not conflict with Dimingo's prior testimony. As for the other examples cited in the Defendants' reply, the Court concludes that the statements in Dimingo's affidavit are not irreconcilable with his prior testimony and do not include inadmissible hearsay. *See id.* at ¶¶ 4, 6, 20, 26, 27, 29.

Accordingly, the Court will only disregard the statements that present an irreconcilable conflict. All other statements will be considered to the extent Dimingo relies on them.

### B. Local Rule 56.1

Local Rule 56.1(b) states that "[a]ll material facts set forth in the movant's statement filed and supported as required . . . will be deemed admitted unless controverted by the opposing party's statement, provided that the Court finds that the movant's statement is supported by evidence in the record." S.D. Fla. L.R. 56.1(b). The Defendants argue that the Court should deem admitted all of the facts Dimingo failed to contest in his response (ECF No. 65) to the Defendants' statement of material facts. (Defendants' Reply, ECF No. 70 at 4–7.) They cite to a series of facts that Dimingo failed to admit or deny and failed to provide relevant citations for.

Although the Court agrees that Dimingo failed to comply with Local Rule 56.1, Dimingo does refer the Court to his second affidavit, in which he directly admits or denies some of the material facts he failed to address in his response to the Defendants' statement of material facts. (*See* Dimingo's Second Aff., ECF No. 63-1.) To the extent Dimingo failed to admit or deny any of the Defendants' material facts in either his response or his affidavit, the Court will deem those facts admitted so long as the Defendants' statement is supported by evidence in the record. *See Robles v. RFJD Holding Co.,* No. 11-62069-CIV, 2013 WL 2422625, at *2 (S.D. Fla. June 3, 2013) (Rosenbaum, J.) ("[E]ven where an opposing party neglects to submit any alleged material facts in controversy, the court must still satisfy itself that the evidence on the record supports the uncontroverted material facts that the movant has proposed."). However, the

Court will not do Dimingo's work for him. *Dent v. Giaimo*, 606 F. Supp. 2d 1357, 1359 (S.D. Fla. 2009) (Ryskamp, J.) ("It is the obligation of the non-moving party . . . not the Court, to scour the record in search of the evidence that would defeat a motion for summary judgment[.]")(quoting *Lawrence v. Wal-Mart Stores, Inc.*, 236 F. Supp. 2d 1314, 1322 (M.D. Fla. 2002)).

### C. FLSA Individual Coverage

The FLSA requires an employer to pay its employee "an overtime wage of one and one-half times his regular rate for all hours he works in excess of forty hours per week." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1298 (11th Cir. 2011). "In order to be eligible for FLSA overtime, however, an employee must first demonstrate that he is 'covered' by the FLSA." *Id.* at 1298. This requires a showing that the jurisdictional prerequisite of "interstate commerce" exists in a given case, a showing that may be made one of two ways—individual coverage or enterprise coverage. *Id.*; *see also Vallecillo v. Wall To Wall Residence Repairs, Inc.*, No. 08-22271, 2008 WL 11333114, at *1 (S.D. Fla. Oct. 31, 2008) (Ungaro, J.) ("Determining the existence of individual or enterprise coverage implicates both the jurisdictional basis and a requisite element of Plaintiff's claim."). Here, Dimingo is only able to pursue his case under an individual-coverage theory as per this Court's previous order.

Congress intended to "regulate only activities constituting interstate commerce, not activities merely affecting commerce." *Thorne v. All Restoration Services, Inc.*, 448 F.3d 1264, 1266 (2006). For individual coverage to apply under the FLSA, a plaintiff must provide evidence that he is "(1) engaged in commerce or (2) engaged in the production of goods for commerce." *Id.* For an employee to be "engaged in commerce," "he must be directly participating in the actual movement of persons or things in interstate commerce by (i) working for an instrumentality of interstate commerce, *e.g.*, transportation or communication industry employees, or (ii) by regularly using the instrumentalities of interstate commerce in his work, *e.g.*, regular and recurrent use of interstate telephone, telegraph, mails, or travel." *Id.* And, "whether an employee is 'engaged in commerce' under the FLSA is 'whether the work is so directly and vitally related to the functioning of an instrumentality or facility of interstate commerce to be, in practical effect, a part of it, rather than isolated, local activity.'" *Mederos v. Garcia*, No. 09-22842, 2011 WL 13172947 at *3 (S.D. Fla. March 18, 2011) (Torres, Mag. J.) (quoting *Mitchell v. C.W. Wollmer & Co.*, 349 U.S. 427, 429 (1955)). "To determine whether an employee performed such work, a court must focus its inquiry on the activities of the employee and not on the business of the employer." *Casseus v. First Eagle,*

*L.L.C.*, No. 07-23228CIV, 2008 WL 1782363, at *3 (S.D. Fla. Apr. 18, 2008) (Gold, J.). The burden is on the plaintiff-employee to demonstrate that individual coverage applies. *Perez v. New Auto Image Marketing, Inc.*, No.: 1:15-cv-21893, 2016 WL 7540272, at *6 (S.D. Fla. May 20, 2016) (Lenard, J.).

Dimingo argues that individual coverage exists because he was guarding trucks and cargo that were regularly traveling in interstate commerce. (Dimingo's Mot., ECF No. 51 at 4.) Relying on *Russell Co. v. McComb*, 187 F.2d 524 (5th Cir. 1951) and related cases, Dimingo argues that security guards, like himself, who watch and guard instrumentalities of interstate commerce are covered by the FLSA. (*Id.* at 2–4.)

To assess whether Dimingo was engaged in interstate commerce, the Court must decide (1) whether the Defendants were instrumentalities of interstate commerce, and if so, (2) whether Dimingo's work involved the interstate movement of persons or things. *See Perez*, 2016 WL 7540272, at *6. The Court must analyze Dimingo's job duties to assess whether he "regularly and 'directly participate[d] in the actual movement of persons or things in interstate commerce' such that individual coverage could exist." *See Montaya v. L.C. 1 Trucking Corp.*, No. 12–23816, 2013 WL 5007621, at *3 (S.D. Fla. Sept. 12, 2013) (Seltzer, J.).

Both parties move for summary judgment on this issue. The Defendants, however, seem to conflate the two ways that an employee can demonstrate that he or she is "engaged in commerce." The Defendants argue that because Dimingo guarded goods and materials that left Florida "once a month," his involvement in interstate commerce is much like the employees who were found by courts to only use instrumentalities of interstate commerce sporadically. The cases the Defendants cite to, however, were cases in which there was a question of whether the employee had regularly used an instrumentality of interstate commerce. *See, e.g., Mayo v. Jean Nicole Hair Salons, Inc.*, 2015 WL 4751202, No. 2:15–cv–115–FtM–38MRM, at *3 (M.D. Fla. Aug. 11, 2015) (concluding that use of telephone to book out-of-state clients and use of credit cards were insufficient for FLSA coverage). Dimingo does not contend that he regularly used an instrumentality of interstate commerce. Rather, Dimingo relies on the fact that he was engaged in commerce by working as a security guard at a yard for companies that had trucks and trailers that transported cargo interstate.

Dimingo relies on Martinez's deposition testimony in support of his position, and while the Defendants claim that his presentation of that testimony is incomplete, the Defendants do not contest the Defendants helped transport cargo across state lines, whether it be from Florida to other states or from other states to California on a regular basis. Instead, the Defendants

focus on the frequency of the cargo shipments from Florida to California, and point to Martinez's testimony that goods would be transported from Florida to California one or two times a month or twice every three months. (Defendants' Resp., ECF No. 68 at 8–9.) However, the Defendants say nothing about the fact that the trucks and trailers were carrying cargo from California to Florida and between other states on a regular basis. Critically, the Defendants do not contest that the vehicles Dimingo was guarding were instrumentalities of interstate commerce.

The Court is persuaded that Dimingo was doing work related to instrumentalities of interstate commerce based on Martinez's testimony. Further, 29 CFR § 776.11(b) states, "employees have been held covered . . . where they perform such work as watching or guarding . . . vehicles which are regularly used in commerce or . . . maintain, watching, or guarding warehouses, railroad or equipment yards, etc., where goods moving in interstate commerce are temporarily held." This describes Dimingo's function at the truck yard. Also, much like the guard in *Russell*, Dimingo's security services contributed materially to the Defendants' interstate business. Accordingly, the Court finds that Dimingo is covered by the FLSA to the extent he can demonstrate that he is an employee under the statute.

### D. Employment Relationship

The FLSA's overtime and minimum wage protections "extend only to 'employees,' a term given a rough outline by a series of broad definitions in the [FLSA]." *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013). The FLSA defines "employee" in relevant part as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), and an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d). These definitions, albeit broad, do not bring independent contractors within the FLSA's scope. *Scantland*, 721 F.3d at 1311.

Dimingo and Defendants both seek summary judgment on the issue of whether Dimingo was an employee or an independent contractor. "Employment status under the FLSA is a matter of law; however, subsidiary findings are considered issues of fact." *Artola v. MRC Express, Inc.*, No. 14-CV-23219, 2015 WL 12672722, at *1 (S.D. Fla. Sept. 25, 2015) (Seitz, J.). Accordingly, if there are disputed material facts supporting a reasonable conclusion that Dimingo was an employee, the Court must allow those disputed facts to be resolved by a jury. *Diego v. Victory Lab, Inc.*, 282 F. Supp. 3d 1275, 1280 (S.D. Fla. 2017) (Moreno, J.).

To determine whether an individual is either an employee or an exempted independent contractor, courts look to the economic reality of the relationship between the parties, and whether that relationship demonstrates that the alleged employee is economically dependent on the alleged employer. *Scantland*, 721 F.3d at 1311. The Eleventh Circuit has considered six factors to assess whether economic dependence exists. *Id.* at 1312. These factors are:

> (1) the nature and degree of the alleged employer's control as to the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon his managerial skill; (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers; (4) whether the service rendered requires a special skill; (5) the degree of permanency and duration of the working relationship; (6) the extent to which the service rendered is an integral part of the alleged employer's business.

*Id*. "No one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor—economic dependence." *Id.* (quoting *Usery v. Pilgrim Equipment Co., Inc.*, 527 F.2d 1308, 1311–12 (5th Cir. 1976). The touchstone inquiry is "whether the alleged employee is economically dependent on the alleged employer or whether, instead, the alleged employee is in business for him or herself." *Robles*, 2013 WL 2422625, at *3.

### (1) Nature and Degree of Employer's Control

"The first factor considers the nature and degree of the alleged employer's control as to the manner in which the work is to be performed." *Scantland*, 721 F.3d at 1313. "Control arises when the purported employer goes beyond general instructions and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." *Diego*, 282 F. Supp. 3d at 1281; *see also Robles*, 2013 WL 2422625, at *4 ("When an alleged employer provides specific direction for how workers, particularly lowskilled workers, are to perform their jobs, courts have weighed the control factor in favor of employee status.") (internal quotation marks and citations omitted). "The nature and degree of an alleged employer's control over work performance matters to the extent that 'it shows that an individual exerts such control over a meaningful part of the business that [they] stand as a separate

economic entity.'" *Artola*, 2015 WL 12672722, at *6 (quoting *Usery*, 527 F.2d at 1312–13).

The Defendants argue that this first factor heavily points to independent-contractor status because they claim they did not maintain any authority or control over Dimingo's provision of security services. (Defendants' Mot., ECF No. 54 at 6, Defendants' Resp., ECF No. 68 at 12–13.) Defendants claim that Martinez never went to the truck yard or provided Dimingo with "any instruction whatsoever" as to how to provide security services. Moreover, the Defendants insist that Dimingo hired his own employees and assigned them the task of providing security services without their involvement. The Defendants also present evidence that Martinez never questioned Dimingo about who was covering his shifts and never completed background checks on these individuals. Further, the Defendants claim that Martinez's only concern was that security was being provided at the truck yard.

Dimingo asserts that Martinez hired and fired him, and dictated his hours. (Dimingo's Mot., ECF No. 51 at 11.) He also claims that he had direct supervisors, one of which was Martinez, whom he would communicate with on a regular basis. He argues that he had to regularly report his activities and was not responsible for making administrative or operational decisions. He cites to examples of instances when he had to speak directly with Martinez about issues at the yard.

Although Dimingo disagrees with the Defendants' characterization of his payment of individuals who covered his shifts as his own hired employees, it is undisputed that he paid others to do his work. Moreover, is undisputed that Martinez never questioned Dimingo about who covered his shifts, and that none of the Defendants performed background checks on these individuals. (Defendants' SUF ¶¶ 24–25, ECF No. 53.) Dimingo also admitted that Martinez would not physically supervise him while he was at the yard and that he only saw Martinez once every three months. (*See, e.g.*, Discovery Resp., ECF Nos. 52-5, Req. No. 7, 66-2, Req. No. 19.)

Based on the evidence presented, this factor weighs heavily in favor of finding that Dimingo was an independent contractor. Dimingo's evidence does not demonstrate that he received specific instructions on how to perform his tasks throughout his employment period. Rather, the evidence indicates that Dimingo was able to manage his time and work with little interference from the Defendants. Further, the fact that Dimingo outsourced his work to individuals without any interference by the Defendants is indicative of the type of independence Dimingo had in complying with his responsibilities.

### (2) Opportunity for Profit & Loss

In evaluating the second factor, the Court "considers the alleged employee's opportunity for profit or loss depending upon [the employee's] managerial skill." *Scantland*, 721 F.3d at 1316. This factor indicates independent-contractor status where the opportunity for profit or loss is dependent on managerial skills "such as initiative, judgment and foresight." *Artola*, 2015 WL 12672722, at *7. An opportunity for profit or loss based "on the worker's efficiency or technical efficiency are not particularly meaningful in distinguishing between employees and independent contractors." *Id.*

Dimingo asserts that he was paid the same rate by the Defendants over the course of his employment and relies on Martinez's deposition testimony and on his statement that he "was not required to generate profit or loss through performance of managerial skills," ECF No. 48-2 ¶ 9, to argue that the second economic-realities factor favors the Court finding that he was an employee. The Defendants insist that Dimingo "very clearly controlled his opportunity for profit by hiring other individuals to perform security services" and rely on the fact that Dimingo admitted that he was able to pursue other work while working for the Defendants in support of their argument that this factor favors a finding of independent-contractor status. (Defendants' Mot., ECF No. 54 at 7; Defendants' Resp., ECF No. 68 at 13–14.)

In evaluating whether Dimingo was able to increase his opportunities for profit, the Court must focus on whether Dimingo was able to increase his opportunities for profit with the Defendants rather than on his own. *See, e.g.*, *Robles*, 2013 WL 2422625, at *5 (rejecting the defendants' argument that the plaintiffs could have increased their opportunities for profit by working for other cleaning services because "th[at] fact extend[ed] beyond the scope of the . . . inquiry, which focuses on the nature of the [p]laintiffs' relationship with [d]efendants"). In evaluating the evidence presented, it appears that Dimingo was paid the same rate throughout his employment period and that his responsibilities at the truck yard did not lend themselves to acquiring additional profits by exercising his managerial skills. *See Diego*, 282 F. Supp. 3d at 1282 ("Diego's work did not require him to exert any managerial skill, especially not in a way that impacted his opportunity for profit or loss."). Therefore, this factor supports finding that Dimingo was an employee.

### (3) Investment

Next, "[c]ourts may find independent contractor status when a worker invests in equipment or materials required for completing his tasks, or hires

other workers to assist him in the completion of his tasks." *Maldonado v. Callahan's Express Delivery, Inc.*, No. 8:13–cv–292–T–33AEP, 2018 WL 398724, at *5 (Jan. 12, 2018). The Defendants argue that Dimingo provided the equipment and materials necessary to provide his security services. The Defendants point to the fact that Dimingo provided his own uniform, badge, security license, and handgun. (Defendant's Mot., ECF No. 54 at 7–8, Defendants' Resp., ECF No. 68 at 14.) The Defendants also cite to the fact that Dimingo deducted those costs from his taxes. Dimingo does not contest these facts and fails to submit argument on this point. This factor accordingly highly favors a finding that Dimingo was an independent contractor, especially considering the fact that Dimingo recruited others to cover his security duties, which is also relevant consideration when evaluating this factor.

### (4) Special Skills

The "utilization of initiative and the employment of special skills indicates independent contractor status." *Artola*, 2015 WL 12672722, at *8. "A worker with unique skills and the opportunity to exercise initiative is more likely to be able to operate as an independent business entity than an interchangeable worker who completes routine tasks." *Id.* Accordingly, "[a] lack of specialization indicates that an individual is an employee, not an independent contractor." *Maldonado*, 2018 WL 398724, at *6 (quoting *Molina v. S. Fla. Express Bankserv, Inc.*, 420 F. Supp. 2d 1276, 1286 (M.D. Fla. 2006).

The Defendants argue that they relied upon Dimingo's particular skills and qualifications to protect the trucks and cargo in the yard. The Defendants cite to the fact that Dimingo was hired because of his vast experience in providing security services and the fact that he had a security license. (Defendant's Mot., ECF No. 54 at 8, Defendants' Resp., ECF No. 58 at 14.). Dimingo concedes that this factor indicates he was an independent contractor. (Dimingo's Resp., ECF No. 64 at 11.) This factor therefore weighs in favor of finding that Dimingo was an independent contractor.

### (5) Permanency and Duration

"The fifth factor considers the degree of permanency and duration of the working relationship." *Scantland*, 721 F.3d at 1318. Generally, a longer, more permanent working relationship weighs toward employee status, whereas a finite, non-exclusive work relationship is indicative of independent-contractor status because they allow for more economic independence. *Artola*, 2015 WL 12672722, at *9.

The Defendants argue that this factor weighs in favor of finding that Dimingo was an independent contractor because Dimingo reported his income on his tax returns as a sole proprietor, hired others to perform his services, and was able to pursue other job opportunities, among other bases. (Defendant's Mot., ECF No. 54 at 8, Defendants' Resp., ECF No. 68 at 14–15.) Dimingo did not respond to the Defendants' motion nor did it provide an affirmative argument in its motion on this point.

The Court first notes that Dimingo's tax-filing status is not determinative because it is the economic reality of the relationship between Dimingo and the Defendants that matters; in fact, some courts have disregarded a plaintiff's tax filing status when the reality of the relationship between the parties indicated a different result. *See, e.g., Robicheaux v. Radcliff Material, Inc.*, 697 F.2d 662, 667 (5th Cir. 1983); *Artola*, 2015 WL 12672722, at *2. Nonetheless, Dimingo's testimony about his tax returns supports the Defendants' assertion that he was paying others to do his work. Although this fact is more relevant to the control and investment factors, this fact does suggest that Dimingo was able to pursue other job opportunities. Despite the fact that Dimingo received payment from the corporate defendants for several years, Dimingo does not claim, and there is no evidence to suggest, that his relationship with the Defendants was exclusive. *Cf. Quarles v. Hamler*, 652 F. App'x 792, 794 (11th Cir. 2016) (concluding that the plaintiff was an employee in part because the defendant-employer told him that he could not work for anyone else). Given these facts, this factor weighs in favor of finding that Dimingo was an independent contractor.

### (6) Integral Part of Business

The last factor the Court considers is whether Dimingo played an integral role in the Defendants' business. *Scantland*, 721 F.3d at 1319. "The more integral the service, the more likely the worker is an employee." *Artola*, 2015 WL 12672722, at *10. Dimingo asserts that he performed several tasks that were central and integral to the Defendants' business. (Diming's Mot., ECF No. 51 at 12.) The Defendants concede that Dimingo's services were an integral part of their business. (Defendant's Mot., ECF No. 54 at 8–9, Defendants' Resp., ECF No. 68 at 15.) Therefore, the Court finds that this factor favors a finding that Dimingo was an employee.

### (7) Consideration of the Factors

The undisputed facts indicate that Dimingo was an independent contractor. In evaluating the reality of the economic relationship between Dimingo and the Defendants, the record indicates that Dimingo provided

security services with little oversight, outsourced much of his work to others without the Defendants' interference, and was able to obtain other job opportunities during the relevant period. Further, Dimingo was hired because of his experience in the field and particular qualifications. Although Dimingo was unable to profit based on his managerial skill and played an integral role in the Defendants' businesses, the facts in the record indicate that he was not economically dependent on the Defendants.[2]

Because the FLSA only applies to "employees," see *Diego*, 282 F. Supp. 3d at 1280, the Court need not decide whether Martinez is an individual employer or whether the corporate defendants were joint employers. Nor must the Court reach the question of which, if any, of the FLSA exemptions could have applied had the Court found that Dimingo was an employee.

### IV. Conclusion

Accordingly, the Court finds that Dimingo has no claim under the FLSA because he is an independent contractor. The Court therefore **grants** the Defendants' motion for summary judgment (**ECF No. 54**) and **denies** Dimingo's motion for partial summary judgment (**ECF No. 51**). The Clerk shall administratively **close** this case. Any other pending motions, aside from the parties' pending sanctions motions (ECF Nos. 72, 74), are **denied as moot**. The calendar call set for **July 3, 2018** and the trial set for the trial period beginning **July 9, 2018** are hereby canceled.

**Done and ordered**, at Miami, Florida, on June 29, 2018.

Robert N. Scola, Jr.
United States District Judge

---

[2] Based on the Court's ruling, the Court need not evaluate the Defendants' arguments about Dimingo's Class D License. (Defendants' Mot., ECF No. 54 at 9–10.)